[Cite as *In re E.A.*, 2026-Ohio-1713.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN RE: E.A. AND H.A. | Case Nos. 2025 CA 0023, 2025 CA 0024 |
| | <u>Opinion And Judgment Entry</u> |
| | Appeal from the Court of Common Pleas, Juvenile Division, Case Nos. 20243019, 20243020 |
| | Judgment: Affirmed |
| | Date of Judgment Entry: May 11, 2026 |

**BEFORE:** Andrew J. King; Kevin W. Popham; David M. Gormley, Judges

**APPEARANCES:** JEFFREY A. MULLEN, for Appellant - Mother; KATELYNN R. DAVIS, for Appellee - Coshocton County JFS.

*King, P.J.*

{¶ 1}   W.V., mother of twins E.A. and H.A., appeals the judgment of the Coshocton County Juvenile Court which terminated her parental rights and granted permanent custody of the children to the Coshocton County Department of Job and Family Services (CCJFS). We affirm the trial court.

**Facts and Procedural History**

{¶ 2}   On April 16, 2024, CCJFS was granted ex-parte emergency custody of E.A. and H.A. born October 13, 2023. The initial concerns centered on mother's substance abuse and allegations of domestic violence between mother and the alleged father, her paramour at that time. Complaints were filed on April 17, 2024 alleging neglect and

dependency and a shelter care hearing was held the same day. The trial court ordered the children to remain in the emergency temporary custody of CCJFS.

{¶ 3} Arraignment was held on May 1, 2024. Mother was appointed counsel and entered denials. An adjudicatory hearing was held on May 14, 2024 where mother entered an admission to dependency and the remaining allegations were dismissed. Disposition followed immediately thereafter. The children were ordered to remain in the temporary custody of CCJFS and in the protective supervision of CCJFS. The children both have special needs due to mother's drug use during pregnancy.

{¶ 4} On March 25, 2025, mother requested a six-month extension. The trial court granted the motion on April 9, 2025.

{¶ 5} On May 19, 2025, CCJFS filed a motion for permanent custody. A contested hearing on the motion was held on August 11 and 14, 2025. Testimony and the final Guardian ad Litem reports established the following facts.

### History, Case Plan, and Progress

{¶ 6} CCJFS presented testimony from nine service providers, the twins' foster mother, and the guardian ad litem. Testimony established that CCJFS first became involved when the twins were born on October 13, 2023, and their umbilical cords tested positive for drugs. Mother subsequently complied with an initial safety plan implemented by CCJFS. The alleged father refused to cooperate with paternity testing and wanted nothing to do with the children.

{¶ 7} Three months later the agency became involved with the family again. In January 2024, a safety plan was again established due to domestic violence and continued drug use. Mother's later case plan required her to obtain substance abuse and mental health assessments and follow all recommendations, learn coping skills, submit to

random announced and unannounced urine drug screens, attend First Step for domestic violence concerns and to address healthy relationship skills, attend individual intensive outpatient counseling (IOP), attend Ohio Start, secure stable housing, obtain and maintain employment, maintain sobriety, and provide for the basic needs of the twins. The goal was reunification. CCJFS proceeded to connect mother to treatment and services.

{¶ 8} Mother did not stay in the location arranged through the safety plan in early January 2024. Rather, she first went to a domestic violence shelter, and then to Michigan to live with family where she claimed she had support. Mother left for Michigan on January 26, 2024, but returned on February 6, 2024 stating she had no help with the children in Michigan. She moved in with a friend, D.B. in Coshocton County who then became her fiancé. Mother's drug use continued.

{¶ 9} On February 8, 2024, mother began services with the Ohio Start program. Mother also completed her assessments at Coshocton Behavioral Health Choices (CBHC). Their recommendations included sober living, IOP, random urine drug screens, individual counseling, and mental health management.

{¶ 10} On March 7, 2024 mother advised her CCJFS case worker that she wished to go to inpatient treatment at Stepping Stones in Portsmouth, located in Scioto County, Ohio. She was admitted to the facility the following day along with the twins. Shortly thereafter she wanted the twins to go live with her family in Michigan or live with D.B. Neither, however, was a suitable placement.

{¶ 11} On April 15, 2024, CCJFS received a report from Stepping Stones that mother was not providing for the children's basic needs, was going to have a medical

procedure that would temporarily limit her ability to lift or care for the children, and was making excuses to avoid her scheduled appointment with CCJFS. On April 16, 2024, the twins were removed from mother's care and placed in the temporary custody of CCJFS. They were placed with a foster family with specialized training for children with trauma issues including medical trauma such as in-utero drug exposure. The twins were six months old at that point. Bi-weekly supervised visitation was approved for mother. Stepping Stones is located one and a half hours away from where the twins were placed. Because of their challenges, the three-hour round trip was difficult for both the children and the foster parents.

{¶ 12} Mother did well at Stepping Stones for a while, then relapsed in August of 2024. Shortly thereafter mother requested a sober living apartment in Coshocton County. Mother returned to Coshocton County on September 9, 2024.

{¶ 13} On October 30, 2024, mother began family dependency treatment through the Coshocton County Juvenile Court. This is a specialized drug court docket program though the Supreme Court of Ohio designed to help families with open child protective services cases due to dependency or neglect reunite with their family while obtaining and maintaining sobriety and completing their case plans. It provides a vast treatment team supported by many agencies including First Step and CBHC. Mother had numerous instances of non-compliance with the program including urine screens positive for fentanyl, Xylazine (a livestock tranquilizer), missing urine screens, failing to report new medications to her case providers, having surgery and receiving opiate painkillers without telling her doctor she was in recovery, sleeping during classes, poor attitude in classes, and failing to do homework.

{¶ 14} Overall, mother had 13 infractions while in the program. She was unsuccessfully terminated from the program on April 22, 2025 due to repeated infractions and the fact that she again decided to relocate to Portsmouth and attend inpatient treatment at Stepping Stones. At that point mother had been kicked out of sober housing for various infractions and failing to keep the housing clean. She had no other options for housing other than inpatient treatment. In-patient treatment options were presented to mother that were closer to the twins to facilitate visitation, but mother decided to attend Stepping Stones.

{¶ 15} Mother entered Stepping Stones for a second time on March 17, 2025. Shortly thereafter CCJFS learned mother was engaged to a new man, H.L. who lived in Portsmouth and possessed an extensive criminal history.

**Visitation**

{¶ 16} Mother's visits with the children began as supervised and eventually she had some overnight visits. Supervised visits began in May, 2024. During supervised visits mother brought food that was not age-appropriate such as beef jerky, failed to internalize advice and apply it to later visits, left the children unattended in highchairs, and was more interested in her phone and taking pictures and videos than actively parenting the children. Ten supervised visits took place between May 10, 2024 and July, 2025. Sarah Lusk, the worker who supervised the visits observed no improvement in mother's parenting skills during that time, observed she favored one twin over the other, and struggled to handle both children at once. Lusk did not feel mother could safely parent the twins on a full-time basis. She further observed no bond between mother and the children. Despite receiving $900 a month in social security benefits, mother failed to provide for the basic needs of the children. She relied on the foster parents to bring food,

clothing, and toys to the visits. When mother did provide clothing, it was either out of season or the wrong sizes even though she was provided with the children's correct sizes.

{¶ 17} Nonetheless, mother was granted overnight visits. On several occasions mother attempted to cancel visits if either she or the children were ill. She had to be reminded that parenting is a full-time endeavor regardless of illnesses. After a three-night visit with mother over Christmas 2024, the twins returned home needing immediate urgent medical care. E.V. was wheezing and H.V had a blistered, weeping rash on his back, bottom, and the backs of his legs. E.V. required two breathing treatments and was sent home with steroids, and H.V.'s rash was suspected to have been caused by sitting too long in a wet diaper. Mother was aware of these issues during the children's visit, but was not concerned by them. Mother's overnight visits were suspended. Shortly after the Christmas visit, mother relapsed again. As late as the month before the permanent custody trial, mother had shown no improvement in her parenting skills during supervised visits.

{¶ 18} Mother provided testimony from four Stepping Stones providers, her sister testified as a character witness and mother's proposed sober support, a friend she met in a domestic violence shelter, and mother then testified on her own behalf. Two of the four Portsmouth providers indicated mother was doing well or phenomenal, yet were unaware she had positive urine screens for muscle relaxers in May and June 2025. Mother testified she was aware her new fiancé had a criminal history involving assaults, but had no knowledge beyond that. Mother insisted she had been sober for a year despite having positive screens just two months before the permanent custody trial.

{¶ 19} Following the conclusion of testimony, the parties filed written closing arguments. On October 10, 2025, the trial court issued its judgment awarding permanent custody to CCJFS, finding the children had been in CCJFS custody for more than 12

months of a consecutive 22-month period and the children's best interests were served by remaining in the custody of their foster parents with whom they were thriving, were bonded with, and with whom they have resided since they were six months old. The trial court further cited mother's inability to meet the children's special needs, the fact that she was given opportunities to reunify yet moved further away from her children and began a relationship with an inappropriate partner, and the fact that the children required legally secure placement that could only be obtained through granting CCJFS's motion for permanent custody.

{¶ 20} Mother filed an appeal and the matter is now before this court for consideration. Mother raises one assignment of error as follows:

I

{¶ 21} "THE TRIAL COURT'S JUDGMENT VIOLATES DUE PROCESS."

{¶ 22} In her sole assignment of error, mother argues the trial court's decision to grant CCJFS permanent custody of the children instead of ordering CCJFS to seek reunification was in violation of her due process right to parent her children. We disagree.

## Applicable Law

## Due Process & Child Custody

{¶ 23} Although "due process" lacks precise definition, courts have long held that due process requires both notice and an opportunity to be heard. *In re Thompkins*, 2007-Ohio-5238, ¶ 12. We recognize "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court].' " *In re B.C.,* 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville,* 530 U.S. 57, 65 (2000). The Ohio Supreme Court has also "long held that parents who are 'suitable' have a 'paramount' right to the custody of their children." *Id.,*

quoting *In re Perales*, 52 Ohio St.2d 89, 97 (1977). (Other citations omitted.) Indeed, the right to raise one's "child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157 (1990). However, "the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed. Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *In re B.C.,* supra at ¶ 17. (Citations and quotations omitted.)

{¶ 24} Indeed, "[p]ermanent termination of parental rights has been described as the family law equivalent of the death penalty in a criminal case. Therefore, parents must be afforded every procedural and substantive protection the law allows." *Id*. at ¶ 19, (Citations and internal quotations omitted). "In the context of termination of parental rights, due process requires that the state's procedural safeguards ensure that the termination proceeding is fundamentally fair." *Id*. at ¶ 17.

{¶ 25} The Ohio Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419. "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who . . . have been temporarily separated." *In re Evans*,  2001-Ohio-2302, *3 (3d Dist.). To that end, case plans establish individualized concerns and goals, along with the steps the parties and the agency can take to achieve reunification. *Id*.

### Permanent Custody

{¶ 26} R.C. 2151.414(B)(1) states in relevant part that permanent custody may be granted to a public or private agency if the trial court determines by clear and convincing

evidence at a hearing held pursuant to division (A) of R.C. 2151.414, that it is in the best interest of the child and any of the following apply:

> ... (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶ 27} R.C. 2151.414(B) therefore provides a two-pronged analysis the trial court is required to apply when ruling on a motion for permanent custody. In practice, the trial court will determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1) (a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**Temporary Custody for at least 12 out of a consecutive 22-month period**

{¶ 28} The "12 of 22" provisions contained in R.C. 2151.413(D)(1) and R.C. 2151.414(B)(1)(d) balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child. *In re C.W.*, 2004-Ohio-6411, ¶22. Through the "12 of 22" provisions in the permanent-custody statutes, the legislature provides parents with 12 months to work toward reunification before an

agency can institute a permanent-custody action asserting R.C. 2151.414(B)(1)(d) grounds. *Id.*

## Best Interests

{¶ 29} R.C. 2151.414(D) governs "best interests" and states:

> (D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ending on or after March 18, 1999;

(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 30} R.C. 2151.414(E) lists factors for a trial court to consider by clear and convincing evidence in its determination whether a child cannot be placed with either parent within a reasonable time or should not be placed with either parent. That section states in relevant part:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

### Mother's Argument

{¶ 31} Mother's argument centers on her decision to attend Stepping Stones in Portsmouth, whether or not CCJFS approved of her decision, and her perception that she was punished for attending Stepping Stones. According to mother, CCJFS pushed for permanent custody because her caseworker and the guardian ad litem strongly opposed her return to Portsmouth. But the record reflects concerns far beyond where mother received treatment and who may have approved or disapproved of her decision to go to Portsmouth.

{¶ 32} As an initial matter, we note that R.C. 2151.414(B)(1)(d) applies in this matter because the children were in the temporary custody of the agency in excess of twelve or more months of the consecutive twenty-two-month period. Mother does not

dispute this fact. This court has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period, standing alone, is sufficient to award permanent custody. *In the Matter of A.S., V.S., and Z.S.*, 2013-Ohio-4018 (5th Dist.). Thus, whether or not mother her was given an opportunity to complete her treatment, improved in her compliance with treatment, or received a second 6-month extension would make no difference in the trial court's decision or this court's decision. The children present with high needs which require consistency of care that mother has demonstrated she cannot provide including providing for their basic needs and ensuring that they attend frequent appointments with doctors, therapists and specialists. Testimony established that the children are thriving in their current foster placement because the foster family is able to provide the appropriate levels of care and support on a full-time basis. Transcript of trial, volume one (T.1) 134-137, 141, Guardian Ad Litem Report of August 7, 2025, CCJFS exhibit 27. The children are bonded with their foster family, but demonstrate no bond to mother. T.1, 153, 192.

{¶ 33} But mother also argues that she should have been granted a second six-month extension and the trial court's failure to do so constitutes a due process violation. A trial court's decision to grant or deny an extension of temporary custody is a discretionary one which we review for an abuse of discretion. See R.C. 2151.415(D)(1) and (2). "Abuse of discretion" means an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). Most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. *AAAA Ent., Inc. v. River Place Community Urban Redev. Corp.,* 50 Ohio St.3d 157, 161 (1990). An unreasonable decision is one backed by no sound reasoning process that would support that decision.

*Id.* "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 34} Pursuant to R.C. 2151.415(D)(1), a trial court can extend temporary custody for six months only if it finds, by clear and convincing evidence, (1) that such extension is in the best interests of the child, (2) that there has been significant progress on the case plan, and (3) that there is reasonable cause to believe that the child will be reunified with a parent or otherwise permanently placed within the period of extension. See *In re McNab*, 2008-Ohio-1638 (5th Dist.).

{¶ 35} While Mother may have made progress on her drug treatment during her second stay at Stepping Stones, as detailed above, the concerns that existed at the beginning of the case still existed at the time of the permanent custody trial. Mother had no housing, no vehicle, no operator's license, failed to provide for the children's basic needs, was engaged to a man with a violent criminal history and on parole for robbery, and demonstrated she is poorly equipped and unwilling to parent the children safely and consistently. T.1, 223-228. During the course of this matter, mother had been engaged to two different men, neither of which were appropriate to be around the twins, demonstrating that she had failed to address healthy relationship skills. T.1, 223-224. In interactions with her CCJFS case worker just prior to the permanent custody trial, mother appeared to be under the influence. T.1, 220. Moreover, the record reflects these are not the first children removed from mother's custody due to similar concerns. Mother had three children removed from her custody in Michigan, including another set of three-month old twins, one of which had suffered skull fractures. Transcript of trial, volume II, (T. II), 292-294. See also, State's Exhibit 23, Guardian ad Litem report of April 8, 2025.

This concerned the guardian ad litem because one child in this matter, E.A., came into CCJFS custody with a deformed head, yet E.A.'s birth records indicate his head was of normal shape. T. II, 294-295. Additionally, mother had criminal charges in Michigan including child endangerment, domestic violence, and OVI. Mother was pregnant with a third child removed from her custody when she was involved in a car crash related to an OVI. T. II, 297.

{¶ 36} There is no evidence on this record to support a conclusion that mother was denied due process either in the agency's motion for permanent custody or the trial court's denial of her motion for a second six-month extension. The children had been in CCJFS temporary custody for 12 out of a consecutive 22-month period, mother had not made satisfactory progress in her case plan goals, and the best interests of the children were served by a grant of permanent custody to CCJFS. Mother had the opportunity to present evidence, through counsel, regarding her ability to parent the twins or make timely progress on her case plan. Her due process rights were therefore adequately protected. *In re T.N.*, 2019-Ohio-2142, ¶ 25 (5th Dist.).

{¶ 37} The sole assignment of error is overruled.

{¶ 38} For the reasons stated in our accompanying Opinion, the judgment of the Coshocton County Court of Common Pleas is affirmed.

{¶ 39} Costs to Appellant.

By: King, P. J.

Popham, J. and

Gormley, J. concur.